FILED
IN CLERK'S OFFICE
US DISTRICT COURT

★ DEC 13 2012

BROOKLYN OFFICE

C/M

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- X
                                              :

MIREOM GADAYEVA,                    :

                     Plaintiff,      :

            - against -          :

COMMISSIONER OF SOCIAL SECURITY,    :

                   Defendant.     :
-------------------------------------------------------- X

**MEMORANDUM
DECISION AND ORDER**

11-cv-2961 (BMC)

**COGAN**, District Judge.

Plaintiff *pro se* brings this action under section 205(g) of the Social Security Act (the

"Act"), 42 U.S.C. § 405(g), seeking review of a final decision of the Commissioner of the Social

Security Administration ("the Commissioner") denying her request for waiver of recovery for

overpayment of Supplemental Security Income ("SSI") benefits in the amount of $11,678.00.

Defendant moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of

Civil Procedure. Defendant's motion for judgment on the pleadings is denied and the case is

remanded for further hearings before the Administrative Law Judge ("ALJ").

## BACKGROUND

The administrative record reveals that plaintiff was born in Pakistan, worked as a

geography teacher in Russia, and emigrated to the United States in 1993. She applied for SSI in

1995; in 1997, an ALJ found plaintiff disabled under the meaning of the Act and eligible for

benefits. In June 2000, plaintiff's husband began working for the New York City Department of

Education as a fingerprint technician. He received his first paycheck in September 2000.

The record indicates that plaintiff received recertification forms every year, except in 2000 and 2001, and that she always completed the forms accurately. By letter dated April 1, 2002, the Social Security Administration ("SSA") requested plaintiff to produce Fleet bank accounts of both plaintiff and her husband from November 1, 1999 to date. By letter dated May 30, 2002, the SSA notified plaintiff of an overpayment in the amount of $7,466.68 for the period of September 2000 through May 2002. Then, by "Notice of Planned Action," dated July 1, 2002, the SSA advised plaintiff that her monthly SSI payments would be stopped beginning August 2002, and that she had been overpaid benefits since November 1999.

It appears that upon receiving either the April or May letter from the SSA, plaintiff went to the SSA office with her daughter for an "unscheduled redetermination," and reported the many changes which were then memorialized in a "Statement of Claimant or Other Person," dated August 7, 2002 ("Statement") and signed by plaintiff and her husband. In this Statement, plaintiff acknowledges that she failed to report her husband's wages. It also states that plaintiff's husband would make monthly payments of $175 to "cover the present overpayment on my wife's SSI record." It further states, "I also acknowledge that we failed to report my wages although it was not intentional," and that the agreement is referring to an overpayment as of June 24, 2002, in the amount of $7466.68. After making two payments of $175, plaintiff thereafter received a new notice of overpayment in the amount of $16,662, after which she refused to make any further repayments.

Plaintiff has had three administrative hearings on the issue of whether she has an obligation to return the overpayment. The first two hearings, before Judge Nisnewitz, resulted in a determination that she owed a refund of $16,662. The Appeals Council set aside the first

2

determination; the Commissioner agreed to a remand of the second determination when plaintiff challenged it in this Court.

After her third administrative hearing, before a different ALJ (Pecoraro, ALJ), the time period during which plaintiff had been overpaid was reduced, and thus the amount of the refund she owed went down to $11,678.[1]  Furthermore, in her Findings of Fact and Conclusions of Law, the ALJ found plaintiff not "without fault" in causing the overpayment because plaintiff "did not inform the [SSA] of her husband's employment, did not report all bank accounts she and her husband owned, and did not report the purchase of a house." The ALJ noted that plaintiff's husband allegedly informed "welfare" that he was employed and that he believed welfare and SSA were the same agency and that SSA would therefore become aware of his employment. However, the ALJ found that plaintiff, by signing the application for SSI, agreed to inform the SSA of any changes and that she failed to do so. The ALJ gave cursory consideration to plaintiff's allegations of mental, educational, and linguistic limitations as well as to her medical evidence. She concluded that plaintiff withheld and failed to provide information that she knew or should have known was material and that recovery of the overpayment was not waived.

Plaintiff did not file timely exceptions to the ALJ's decision and that decision became the final decision of the Commissioner.

## DISCUSSION

Section 204(b) of the Act, 42 U.S.C. § 404(b), provides that "[i]n any case [of overpayment], there shall be no adjustment of payments to, or recovery by the United States

---

[1] There had been an issue of where plaintiff got the money to buy her house and whether she and her husband had bank accounts exceeding the $3000 limit for SSI eligibility during the period of November 1999 to August 2000. Judge Pecoraro essentially ruled for plaintiff on those issues.

from, any person who is without fault if such adjustment or recovery would defeat the purpose of this subchapter or would be against equity and good conscience." An overpaid beneficiary will be found "at fault," if (a) she made an incorrect statement that she knew or should have known was incorrect; or (b) she failed to furnish information which she knew or should have known was material; or (c) she accepted a payment which she knew or should have known was incorrect. 20 C.F.R. §404.507. The burden is on the recipient of an overpayment to demonstrate that she is without fault and that recovery would defeat the purpose of the Act or would be inequitable. 42 U.S.C. § 1383(b); see also Center v. Schweiker, 704 F.2d 678 (2d Cir. 1983).

The concept of fault is broadly construed, enabling the Commissioner to recover overpayments with relative ease. See Barone v. Brown, 869 F.2d 49 (2d Cir. 1989). As the Second Circuit noted in Center, 704 F.2d at 680, the breadth of the "fault" determination is such that a claimant need not act in bad faith or intend to deceive the Commissioner into making the overpayment; "rather, an honest mistake may be enough." Moreover, a claimant will be at fault if she failed "to exercise a high degree of care in determining whether [changed] circumstances which may cause deductions from [her] benefits" should be reported. 20 C.F.R. §404.511(a).

Distillation of these principles results in the conclusion that if the claimant is negligent in failing to report changed financial circumstances, she is not without fault. However, unlike most questions of negligence, the "fault" determination has both objective and subjective components. This is apparent from the fact that in determining whether the claimant is without fault, the Commissioner must consider "all pertinent circumstances, including the individual's age and intelligence, and education, and any physical, mental or linguistic limitations." 20 C.F.R. §404.507. Lack of comprehension, therefore, must also be considered. See Schwingel v. Harris, 631 F.2d 192 (2d Cir. 1980).

In reviewing determinations that a claimant is not without fault, this Court has to apply the familiar "substantial evidence" test: findings of the Commissioner as to any fact, if supported by substantial evidence, are conclusive. See Center, 704 F.2d at 679. Substantial evidence is "more than a mere scintilla," meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 198, 229, 59 S. Ct. 206, 217 (1938)). My function is merely to determine whether the Commissioner applied the proper legal standards and whether his determination is supported by substantial evidence in the record as a whole. See 42 U.S.C. §§405(g), 1382(c)(3). This means that even if I could reasonably reach a different conclusion than the Commissioner, I cannot substitute my own judgment if that of the Commissioner was based on substantial evidence. See Jones v. Sullivan, 949 F.2d 57 (2d Cir. 1991).

Although I am extremely reluctant to remand this case for a further hearing, given that there have already been three, I cannot tell from the ALJ's decision whether there was substantial evidence to support her conclusion that plaintiff was not without fault. Most of the very brief consideration of the "without fault" issue in her decision consists of rejecting plaintiff's arguments as to why she was without fault. But there is very little reference to affirmative evidence showing that plaintiff was at fault. It seems clear that the ALJ was, in some part, relying on testimony that plaintiff gave at one of her prior hearings – and, indeed, the Commissioner cites to the prior proceedings in his brief before me – but there is no indication in the ALJ's decision whether and to what extent the prior proceedings and findings factored into her decision.

5

As to the most recent hearing that gave rise to this action, there was very little testimony from plaintiff at all. Most of the statements on the record came from her son and representative, who did the talking for her. There is nothing wrong with that, as a general matter, but since credibility is inevitably an issue in determining what a claimant knew or should have known, the ALJ needed to hear primarily from plaintiff. Indeed, there is nothing in the last hearing even inquiring of plaintiff as to whether she knew she had to report her husband's new income. I do not see how the ALJ can determine the issue of whether plaintiff was "without fault" when she barely heard from plaintiff.

The extent to which the Judge Pecoraro was relying on testimony from the prior hearing in unclear because, while she recited that she had reviewed the entire record, she did not specifically refer to anything in the prior hearings. Even if she had so stated, that prior testimony, or more particularly, the questioning that led to it, was problematic, especially if Judge Pecoraro was using it to determine credibility. The ALJ at the prior hearing was overly aggressive and made credibility findings on the record, immediately following even a few words by plaintiff. He often asked compound questions and it is unclear whether an interpreter was used during her examination at all, even though it appears one was sworn in.[2] The ALJ insisted on figuring out whether plaintiff needed an interpreter even though plaintiff's counsel specifically mentioned to the ALJ that plaintiff had difficulty understanding colloquy that was not translated at the prior hearing. It is probable that plaintiff was intimidated by the ALJ. The

---

[2] The following is one of many examples of the ALJ's aggressive questioning: "Okay, when did you come to the United States? Do you speak English? Can you speak English to me? If you don't understand it – here is what I want you to do, no. Just listen to what I say, okay. I'm the Judge, and I want you to do it my way. I want you to speak English to me because I want to see how much English you speak, number one. Number two, if you don't understand me, we'll use the interpreter, right? So if you don't understand me, just raise your hand, use the interpreter. If I don't understand you, I'll raise my hand and I'll call on the interpreter. I don't have to raise my hand. Okay? Because it goes a lot faster if you speak English too. Okay. . . ."

ALJ often barely let plaintiff or her attorney (she was represented at the prior hearing, unlike the hearing before Judge Pecoraro) get a word in edgewise.

The insufficient findings in the hearing before Judge Pecoraro were in a sense portended by the prior hearing. Because of the aggressiveness of the prior ALJ, that prior hearing became sidetracked into the question of whether plaintiff intentionally attempted to defraud the SSA. That, of course, would make plaintiff not without fault, but as the law cited above makes clear, even a negligent plaintiff, with no intent to deceive, may not qualify for a "without fault" finding. The current decision under review makes no findings of intent to bamboozle the SSA; it conservatively concludes that plaintiff has not sustained her burden of proving that she is without fault. Yet even in the proceedings before me, plaintiff's son and representative understandably continues to focus on the issue raised by the ALJ at the prior hearing, i.e., he insists that his mother did not intend to deceive the SSA. He does not seem to understand that even if his mother did not intend to deceive anyone, she still may have to return the overpayment.

The difficulties I have with Judge Pecoraro's decision are as follows.

First, in response to plaintiff's claim that she had a medical condition that left her unable to appreciate her obligation, the ALJ pointed out that the medical records do not support that statement. However, I cannot read the medical records that are part of this administrative record because they are illegible, and the ALJ did not cite to any particular record. In his brief in this case, the Commissioner argues that she has limitations from diabetes and hypertension, not a mental impairment, so her disability should not weigh in determining whether she is without fault. Yet her representative points out that among the manifestations of her physical impairments are a mood disorder, depression and blurred vision. This is not just her representative's assessment – he claims, at least, that the ALJ who found her disabled in 1997

7

found that she suffered from these conditions as well, and that they have worsened. It is entirely possible that plaintiff's mood disorder, depression, and blurred vision do not rise to the level, by themselves, of constituting a "disability," as defined under the social security law. Yet they could constitute sufficient mitigating factors to warrant a finding that plaintiff was "without fault" as defined under that law. I do not know because the ALJ did not address that.

This could be particularly important because, at least as far as I can tell from the record, plaintiff's position is that she did not know that she was obligated to report all changes in her financial circumstances to the SSA. Therefore, the critical question is whether she should have known of her obligation to report. Plaintiff alleged that she did not receive recertification forms in 2000 and 2001 and so she did not report any changes; however, when the SSA contacted her for bank account statements, plaintiff dutifully disclosed all changes in her financial circumstances, including her husband's employment. This is at least some circumstantial evidence that plaintiff was unaware of her reporting obligation. Of course, she and her representative now know that the absence of a contact from the SSA does not relieve a beneficiary from the obligation to report changes in income. But the fact that she fully disclosed the income when asked has to be considered in determining her understanding of that obligation at the time the disclosure should have been made. What may be obvious to us as lawyers and judges may not be so obvious to a disabled person.[3]

---

[3] The Commissioner, quoting <u>Cruz v. Astrue</u>, No. 08-CIV-5588, 2009 WL 1835632, *4 (S.D.N.Y. Jun. 24, 2009), states that SSI recipients are "repeatedly advised about the income and resource requirements," and draws the inference that plaintiff was so advised here as well. However, there is nothing in the record containing such direct advice, apparently because plaintiff's original application for benefits has been lost. The Commissioner, instead, has annexed to his brief the form used to apply for benefits, which contains the admonition. He thus argues circumstantially that plaintiff knew or should have known of her affirmative obligation. But the application form is 24 pages long, and the obligation to report is set forth on pages 23 and 24 – after the claimant has signed the application on page 22. It seems to me not unreasonable to expect the ALJ, since she lacks plaintiff's original application, to at least show plaintiff the form, ask her whether she recalls seeing the language, and then make a determination either as to credibility or that the failure to read on after signing itself constitutes fault.

The strongest evidence supporting the ALJ's finding that plaintiff was not without fault is the "Statement of Claimant or Other Person" that she and her husband signed in 2002 ("Statement"), in which plaintiff acknowledges the failure to report her husband's income and agrees to repay the benefits she received while he was working. However, there are several problems with the Statement. My initial difficulty is that I have no idea what it is. It does not appear to be an official SSA form. Neither the ALJ's decision nor the Commissioner's brief say anything about the circumstances under which it was prepared; they simply cite it and contend that it shows plaintiff is at fault. Plaintiff's representative asserts that employees of the SSA drafted the document and threatened plaintiff and her husband that the amount of overpayment they owe would increase if they did not sign the document. If that is the case, then the probative value of the Statement is severely undercut because instead of demonstrating that plaintiff knew or should have known of her obligation to report her husband's employment, it would only show that she later recognized and acknowledged, under pressure, her failure to report. Since there is no testimony regarding this incident, it is impossible to know what really happened. If I am going to consider the Statement in determining whether it constitutes a portion of the "substantial evidence" of the fact that plaintiff was at fault, the record has to disclose the circumstances of how the statement was created.[4]

Moreover, I note that the first signature on the Statement is that of plaintiff's husband, and that the document has only one signature line; plaintiff's signature is scratched below that of her husband, which is on the signature line. This is indicative of another problem in the ALJ's decision, which is that it seems to presume knowledge of the reporting obligation on the part of plaintiff's husband, and then impute it to plaintiff. It does this by noting plaintiff's statement

---

[4] This is one of several areas where a reply brief from the Commissioner might have helped, but the Commissioner advised the Court that he did not intend to submit one.

that plaintiff's husband timely reported his income to what is variously referred to as the
"Welfare Agency," apparently a City or State agency, and that plaintiff thought this satisfied her
reporting obligation to the SSA. From this statement, the ALJ found, and the Commissioner
argues here, that plaintiff's statement that she did not know of her reporting obligation is not
credible. The ALJ thus stated: "[T]he claimant's spouse is employed as a customer information
representative with the New York City Department of Education . . . and therefore would be
aware that welfare agency and Social Security are not one and the same."

But the standard is not what plaintiff's husband knew or should have known; it is what
plaintiff knew or should have known. There is nothing in the record concerning discussions
between plaintiff and her husband about his reporting to the "Welfare Agency." It may well be
that plaintiff only learned of her husband's action after she learned that she had failed to report.
Even if they did discuss at the time her husband's report to the welfare agency, the ALJ had no
way of knowing whether plaintiff's husband did anything more than mention that he had taken
care of whatever obligations she had. The questions were just never asked. I think they have to
be before plaintiff is charged with her husband's knowledge or his negligence. It does not strike
me as patently incredible (as it did the ALJ at the second hearing), that a foreign-born person
with limited English language skills could get confused as to who is administering the multiple
kinds of benefit programs made available to the disabled and impoverished, especially since
those programs sometimes do overlap jurisdictionally.

Finally, I cannot find that the ALJ's evaluation of plaintiff's subjective characteristics
constituted substantial evidence that she is at fault. The ALJ relied on two main points: (1)
plaintiff was a teacher in the Soviet Union; and (2) she passed her citizenship test so she must
know English. The first fact is not very substantial; plaintiff had not taught in decades, and when

10

she did teach, it was in Russian. The second fact also seems to have limited probative value, for

I cannot help but note that U.S. citizens are not expected to understand the words "VOTE

HERE" in English, as those words are translated into multiple languages at every polling place in

the City of New York. If citizens are not expected to understand the words "VOTE HERE,"

plaintiff's having passed the citizenship test offers limited comfort that she could understand the

two pages of detailed instructions following her signature on her disability application. There

needs to be a more searching examination of plaintiff's English language abilities.

## CONCLUSION

For these reasons, the case is remanded for further hearings before the ALJ.[5] If the ALJ

concludes that plaintiff is not without fault, she shall make specific findings as to the following

questions: (1) did plaintiff have actual knowledge of her obligation to report her husband's

income and the fact that her and her husband's bank accounts exceeded the $3000 limit for SSI

eligibility from October 2000 through November 2001 and April through June 2002; (2) if not,

did plaintiff have the mental ability and proficiency in English to have understood her obligation

to affirmatively report these changes. As to both questions, the ALJ shall refer to specific

evidence in the record to support the findings.

**SO ORDERED.**

_____
L.
U.S.D.J.

Dated: Brooklyn, New York
December 12, 2012

---

[5] The Court notes that plaintiff's son has served as his mother's representative during much of this administrative action. As tempting as it may be to answer questions for his mother, he must refrain from interfering with the ALJ's examination of plaintiff. He may have felt the need to do that because of the aggressive examination undertaken by Judge Nisnewitz at the prior hearings. However, he must let his mother answer the ALJ's questions first, and then if he thinks her answers were incomplete or incorrect, he can ask his own questions of his mother once the ALJ has completely finished her inquiry.

11